UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAWRENCE CELANO, RICHARD THESING, and WILLIAM HEFFERON,

        Plaintiffs,

    v.

MARRIOTT INTERNATIONAL, INC., a Delaware corporation,

        Defendant.

_____/

No. C 05-4004 PJH

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; VACATING PRETRIAL AND TRIAL DATES**

Plaintiffs' and defendant's motions for summary judgment came on for hearing before this court on December 12, 2007. Plaintiffs Lawrence Celano, Richard Thesing, and William Hefferon ("plaintiffs") appeared through their counsel, Nance F. Becker and Kevin Knestrick. Defendant, Marriott International, Inc. ("defendant" or "Marriott") appeared through its counsel, Gregory F. Hurley. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court GRANTS IN PART AND DENIES IN PART plaintiffs' motion for summary judgment and DENIES defendant's motion for summary judgment.

## BACKGROUND

This is a disability access case. Plaintiffs Celano, Thesing, and Hefferon filed this proposed class action arising under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the California Disabled Persons Act ("CDPA"), Cal. Civil Code §§ 54 *et seq.*, and California's Unruh Civil Rights Act, Cal. Civil Code § 51. Plaintiffs allege that defendant's failure to provide "accessible" or "single-rider" golf carts to allow disabled persons to play golf at defendant's courses violates these provisions. Plaintiffs seek a

1    declaration that Marriott's policies are unlawful and an injunction requiring defendant to

2    provide single-rider carts at each of its golf facilities.  They do not seek damages.

3         Plaintiffs filed their original complaint in this court on October 4, 2005, and amended

4    their complaint on October 18, 2006.  All three plaintiffs require a single-rider cart to play

5    golf.  Mr. Celano sustained a spinal cord injury while serving in the United States Army and

6    must use a wheelchair; Mr. Thesing suffers from a mobility disability due to a driving

7    accident and must use a wheelchair; and Mr. Hefferon has limited use of the left side of his

8    body due to a stroke.  A single-rider cart is a specially-designed golf cart that allows

9    individuals with mobility impairments to hit the golf ball while seated in the cart on a rotating

10   swivel seat.  The carts also contain hand brakes and accelerators to allow mobility-impaired

11   users to drive them.

12        Marriott owns and operates twenty-six golf courses throughout the United States.

13   Plaintiffs contacted several Marriott golf resorts expressing an interest in playing at the

14   resort's golf courses and requesting a single-rider golf cart.  Each plaintiff was told that

15   Marriott does not maintain single-rider carts at its courses.  Celano and Thesing then wrote

16   letters to Marriott complaining about the lack of single-rider carts.  In response, Marriott

17   informed them that it was not required by current ADA rules to maintain single-rider golf

18   carts.  While Marriott informed plaintiffs that they could bring their own single-rider carts to

19   its courses, plaintiffs claim this is impractical because:  1) the carts are too difficult to load

20   on and off of a trailer; and 2) it is impracticable to bring their own carts when traveling out of

21   state.

22        On April 18, 2007, this court denied plaintiffs' motion for certification of a national

23   class and a California subclass representing individuals with mobility disabilities who

24   require an accessible golf cart.  These summary judgment motions followed.

**DISCUSSION**

25

26   **A.    Summary Judgment Standard**

27        Summary judgment is appropriate when there is no genuine issue as to material

28   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.

"To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some significant probative evidence tending to support the complaint." *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted). The court must view the evidence in the light most favorable to the non-moving party. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323. Regardless of whether plaintiff or defendant is the moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial." *Id.* at 322.

**B.     Title III of the ADA**

Plaintiffs' ADA claim arises under Title III of the ADA, which prohibits discrimination against disabled individuals in any place of public accommodation, and provides injunctive

3

relief against private entities that discriminate against the disabled. 42 U.S.C. § 12182(a); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). Damages are not recoverable under Title III of the ADA. *See* § 12188(a)(1); *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002).

An individual alleging discrimination under Title III must show that: (1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability. *PGA Tour,* 532 U.S. at 683 n. 38. If the plaintiff makes such a showing, the defendant must make the requested modification unless it proves that doing so would alter the fundamental nature of its business. *See id.*

Title III applies to persons and entities "who own[], lease[] (or leases to), or operate[] a place of public accommodation." 42 U.S.C. § 12182(a). The Supreme Court has held that lessors and operators of golf courses, even those who do not own the facility and use the course for a limited period of time, are covered by the ADA. *See id.* at 677; *see also Disabled Rights Action Committee v. Las Vegas Events, Inc.* 375 F.3d 861, 873-74 (9th Cir. 2004).

The determination as to whether a particular modification is "reasonable" and "necessary" involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question, and the cost to the organization that would implement it. *See Fortyune v. American Multi-Cinema, Inc.,* 364 F.3d 1075, 1083 (9th Cir. 2004); *see also Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 818 (9th Cir. 1999).

**C.     State Law Claims**

**1.     California Disabled Persons Act (CDPA)**

The CDPA provides that "[i]ndividuals with disabilities . . . have the same right as the general public to the full and free use of . . . public facilities, and other public places."

4

Cal. Civ. Code § 54(a). Under the CDPA, "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities and other public places." Cal. Civ. Code § 54(a). Further, "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations . . . places of accommodation, amusement, or resort, and other places to which the general public is invited. . . " Cal. Civ. Code § 54.1(a)(1). The CDPA incorporates by reference an individual's rights under the ADA. Cal. Civ. Code §§ 54(c), 54.1. Thus, a violation of the ADA also constitutes a violation of the CDPA. *See Pickern v. Best Western Timber Cove Lodge Marina Resort*, 194 F.Supp.2d 1128, 1130 (E.D. Cal. 2002).

## 2. Unruh Act

The Unruh Civil Rights Act protects the right of California residents to "full and equal accommodations . . . in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). In 1992, the Unruh Act was amended to provide that "[a] violation of the right of any individual under the Americans with Disabilities Act (Public Law 101-336) shall also constitute a violation of this section." Cal. Civ. Code § 51(f).

The California Supreme Court has held that the Unruh Act prohibits only intentional discrimination. *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1175 (Cal. 1991) ("[W]e hold that a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act."). However, *Harris* was decided prior to the 1992 amendment that added § 51(f). Thus, the question arose as to whether, as a result of the 1992 amendment, a showing of intentional discrimination was required in cases where the plaintiff predicated his Unruh Act

claim on a showing that the defendant violated the ADA.  In 2004, the Ninth Circuit held that "no showing of intentional discrimination is required where the Unruh Act violation is premised on an ADA violation."  *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 847 (9th Cir. 2004).

**D.    Parties' Motions**

       **1.    Summary of Motions**

            **a.    Plaintiffs**

In terms of plaintiffs' prima facie case of discrimination, plaintiffs note that each plaintiff is disabled as defined by the ADA.  Second, they note that Marriott owns, leases, and/or operates twenty-six public golf facilities throughout the continental United States. Third, plaintiffs have alleged three theories in support of a discriminatory policy or practice, and have moved for summary judgment on all three theories including: (1) Marriott's failure to make reasonable accommodations under 42 U.S.C. § 12182(b)(2)(A)(ii); (2) Marriott's failure to remove barriers under 42 U.S.C. § 12182(b)(2)(A)(iv); and (3) Marriott's failure to provide auxiliary aids and services under 42 U.S.C. § 12182(b)(2)(A)(iv).

Turning to the fourth element, plaintiffs contend that Marriott has discriminated against them by failing to make accessible golf carts available to would-be seated golfers at Marriott-managed resorts.  They argue that this modification is reasonable because it would enable each of the plaintiffs to play at Marriott courses that they are otherwise unable to, and that in terms of finances, the modification is eminently reasonable given Marriott's operational budget.  In support of the modification's reasonableness, plaintiffs note that since their filing of this lawsuit, Marriott has implemented a pilot project of introducing golf carts at the four courses it owns.  Plaintiffs also argue that accessible carts are necessary because plaintiffs are unable to play otherwise.  They note that many disabled golfers don't own their own accessible carts, and that if they do, it is not feasible for them to transport the carts to Marriott's courses given their disabilities.

In opposition to plaintiffs' motion, Marriott raises two issues that are not raised in its own motion, including that Federal Rule of Civil Procedure 19 requires joinder of the owners of the golf courses operated, but not owned by Marriott, because the owners will have to pay for the accessible carts and could be subjected to liability if there are safety issues with the carts. Marriott also argues that it is impractical for the court to grant the injunctive relief plaintiffs seek because the relief is infeasible.

### b. Marriott

In its motion, Marriott contends that it is entitled to judgment on several grounds. Preliminarily, Marriott argues that plaintiffs lack standing, and that alternatively, plaintiffs' claims are rendered moot because Marriott has made accessible golf carts available at the four courses it owns.

As for the merits of plaintiffs' ADA claim, Marriott argues that plaintiffs cannot rely on the general anti-discrimination provisions of the ADA for their claim, and that the ADA and its implementing regulations do not require golf courses to purchase single-rider carts. Marriott further contends that it does not discriminate against disabled golfers because it allows them to bring their own accessible carts and because it makes other accommodations on courses that it owns and operates.

Marriott also argues that the accommodations plaintiffs request are not required by the ADA because the carts constitute "personal devices," and do not constitute auxiliary aids. Finally, Marriott contends that the accommodation plaintiffs request is not required because it constitutes a direct threat to the health and safety of others, and argues that there is evidence that the carts may be unsafe and that Marriott is still in the process of evaluating their safety with its pilot program.

As for plaintiffs' state law claims, Marriott argues that this court should decline to exercise jurisdiction over them.

### 2. Analysis

Because many of the issues raised by the parties' summary judgment motions are overlapping, the court addresses together the common issues. It addresses first the issues

preliminary to the merits, then the issues pertinent to the merits of the ADA claim, and finally, the state law claims raised by plaintiffs.

### a. Preliminary Issues

### i. Mootness

On August 14, 2006, Marriott instituted a pilot program at the four golf courses that it owns, by which it leased at least one single-rider golf cart with a stand-up seat, the EZ Go Eagle, in order to determine the level of demand for such carts and their safety. Marriott argues that its remedial efforts render plaintiffs' ADA claim moot.

In opposition, plaintiffs argue that their ADA claim is not moot because Marriott's pilot program is limited to the courses it owns, and has not been implemented at the facilities they manage and/or operate. Plaintiffs further cite to extensive evidence that, at the courses that it operates, Marriott actively directs and controls the decision regarding whether a course is, or is not, accessible to the mobility-impaired. Plaintiffs also note that the pilot project is just that - a "pilot" project, and that there is no guarantee that Marriott will continue with the project. Marriott did not respond to plaintiffs' arguments in its reply.

The court concludes that Marriott's pilot program does not render plaintiffs' ADA claim moot, and DENIES Marriott summary judgment on this basis. First and significantly, under the ADA, an *operator* of a facility is liable under the ADA as well. *See Lentini*, 370 F.3d at 849; *Las Vegas Events*, 375 F.3d at 861. Marriott concedes that it has not implemented the pilot program at the twenty-two courses that it operates. Second, by its own concession, Marriott has suggested that the pilot program at the courses it owns may be temporary.

### ii. Plaintiffs' Standing

Marriott also argues that plaintiffs lack standing because they cannot establish that they attempted to visit all twenty-six of its owned and operated golf courses, for which they seek relief, and thus they were not personally knowledgeable of all of the alleged barriers they might face and/or all of Marriott's discriminatory policies and practices at all of its courses. It contends that the only course plaintiffs actually attempted to play was

8

Camelback in Arizona, a Marriott-owned course, and notes that the Camelback course now offers accessible carts in conjunction with the pilot program. Marriott also argues that plaintiffs lack standing because they visited the Camelback golf course for the sole purpose of filing a lawsuit.

Plaintiffs respond that it is enough that Marriott's nationwide policies deterred them from visiting or patronizing its owned and operated golf courses, and that they were not required to physically attempt to play all of its golf courses. Plaintiffs note that they each have a mobility disability which requires an accessible cart, that each asked Marriott to provide an accessible cart, and that each was told that Marriott would not accommodate the request. They contend that this was enough to deter them from playing Marriott's courses, and that there was no need for them to subsequently physically attempt to play or visit the courses. Plaintiffs further note that Marriott's policies regarding accessible golf carts are identical at all of the courses that it owns and/or operates.

To satisfy Article III's case or controversy requirement, plaintiffs need to show that: (1) they have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of, or in other words, that the injury is traceable to Marriott's challenged actions; and (3) that the injury can be redressed by a favorable decision. *Doran v. 7-Eleven, Inc.,* 506 F.3d 1191, 1195 (9th Cir. 2007).

In the context of injunctive relief, a plaintiff must additionally demonstrate "a sufficient likelihood that he will again be wronged in a similar way[.]" *Fortyune,* 364 F.3d at 1081. That is, he must establish a "real and immediate threat of repeated injury." *Id.* While "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy," *Lyons,* 461 U.S. at 103, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.*

In terms of standing to assert a claim under the ADA, the Ninth Circuit has held

that a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered "actual injury." Similarly, a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers "imminent injury."

*Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002).

The court concludes that all three plaintiffs have standing to bring their ADA claim as to all twenty-six of Marriott's courses nationwide, owned and/or operated, and DENIES Marriott summary judgment on this basis. It is unnecessary that plaintiffs *actually* visit each of the golf courses to have been deterred from playing there. *See id; see also Doran*, 506 F.3d at 1195-96. All three plaintiffs have attempted to arrange tee times at numerous Marriott courses, but have been unable to play because Marriott advised them that it did not provide accessible carts. Additionally, all three plaintiffs have demonstrated that they require accessible carts to play golf, and that they regularly play golf on non-Marriott courses where accessible carts are available. Finally, all three plaintiffs indicate a sufficient interest to play on Marriott courses nationwide.

Given the fact that the three plaintiffs have demonstrated a sufficient desire to play on Marriott courses and knowledge of the fact that by virtue of its national corporate policy, Marriott does not supply accessible carts, Marriott's argument that these mobility-impaired plaintiffs actually have to show up in person at the courses in order to have standing to assert the ADA claim here flies in the face of established ADA law, under which deterrence alone provides a sufficient injury in fact. *See Pickern*, 293 F.3d at 1138. Additionally, given the fact that Marriott's pilot program is temporary, and that it still operates courses that do not provide accessible carts, future injury is also imminent. *See id.* Finally, there is also sufficient evidence that plaintiffs' injuries would be redressed by a favorable decision because they have all attested that they would play at Marriott courses if provided with accessible carts.

### iii. Joinder of Owners

In its opposition to plaintiffs' motion, Marriott contends that the owners of the golf courses that it manages or operates must be joined under Federal Rule of Civil Procedure

10

19. It does not, however, specify the relief that it is seeking based on plaintiffs' alleged Rule 19 violation, other than to note that it is plaintiffs' burden to join all necessary parties.

Marriot argues that under all of its management agreements, the purchase of an accessible cart would constitute a capital improvement that must be paid for by the *owner*. It asserts that is the reason that it has implemented the pilot program only at the courses that it owns. Marriott further argues that the owners must be joined based on their potential liability for any accidents involving the accessible carts.

In reply, plaintiffs note that under Marriott's management agreements, Marriott reserves the right and responsibility to comply with the law, and guarantees owners that their properties will be managed in accordance with uniform Marriott standards. They note that Marriott receives revenue in the millions simply for its provision of expertise in the management of the golf courses, and that decisions regarding accessibility are inherent in management. Plaintiffs further note that the evidence shows that it is in fact Marriott and its employees that decide what equipment to provide at the managed courses, what fees to charge, and what policies govern access to the courses. Plaintiffs argue that regardless of who actually pays for the lease of a golf cart, Marriott is the party that has made the decision not to make accessible golf carts available, and that it is *Marriott's* discriminatory policy that is at issue here. Plaintiffs additionally argue that joinder of the owners is unnecessary because a judgment against Marriott would not alter its contracts with golf course owners. Plaintiffs further contend that joinder of the owners is impractical because there are over a dozen different entities that own the courses.

Federal Rule of Civil Procedure 19 provides in pertinent part:

(a) Persons Required to Be Joined if Feasible.

　　(1) *Required Party*. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

　　　　(A) in that person's absence, the court cannot accord complete relief among existing parties; or

　　　　(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence

11

may:
> (i) as a practical matter impair or impede the person's ability to protect the interest; or

> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Ninth Circuit has held that under Rule 19(a), a party may be "necessary" in one of two ways. *Las Vegas Events, Inc.* 375 F.3d at 879. First, under Rule 19(a)(1)(A), a party is deemed "necessary" if complete relief cannot be granted in its absence.[1] *Id.* "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Id.* (quoting *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043 (9th Cir.1983)). In conducting the Rule 19(a)(1)(A) analysis, the court asks whether the absence of the party would preclude it from fashioning meaningful relief as between the parties. *Id.* Rule 19(a)(1)(B), by contrast, focuses on whether the absent party's participation is necessary to protect its legally cognizable interests or to protect other parties from a substantial risk of incurring multiple or inconsistent obligations because of those interests. *See* Fed. R. Civ. P. 19(a)(1)(B)(i)&(ii).

The Ninth Circuit recently addressed a similar issue in *Las Vegas Events, Inc.* 375 F.3d at 861. In *Las Vegas Events*, plaintiffs brought a claim under the ADA alleging that disabled persons had been subjected to discriminatory access based on the defendant's operation of a rodeo. Defendants were private entities that staged the rodeo at a Las Vegas arena, publicly-owned by the University System, a sub-entity of the State of Nevada. *Id.* Defendants moved to join the University System as a necessary party pursuant to Rule 19. *Id.* The district court concluded that the University System was a necessary and indispensable party because it was the entity that owned and operated the arena, and that

_____

[1]On December 1, 2007, Rule 19 was amended. Previously, the predecessor to Rule 19(a)(1)(A) was found at Rule 19(a)(1); and the current version of Rule 19(a)(1)(B) was found at Rule 19(a)(2). Those sections of Rule 19, although re-labeled, remain substantively the same.

complete relief among existing parties was not possible because enforcement of any judgment would require the cooperation of the University System.

The Ninth Circuit reversed and remanded, concluding that the University System was not a necessary party under Rule 19. The court noted that "the district court entirely failed to consider whether remedies not requiring [the] University System's cooperation would provide meaningful relief." *Id.* at 879. The court considered the limitations of the leasing agreement between the private entity and the public owner, noting that the lease "does not prevent [the private entity] from taking action to make the [r]odeo accessible to the degree possible within the scope of its lease. . . ." *Id.* at 880. The court also found that the district court could grant meaningful relief by enjoining the private entities from making "certain kinds of operational decisions regarding conditions over which they have control." *Id.*

Here, like the defendants in *Las Vegas Events,* Marriott, under its management agreements with the owners, is exclusively responsible for the operation and management of the golf courses, including the decision whether or not to allow accessible carts on the courses, and whether or not to provide accessible carts to the public. At the December 12, 2007 hearing, Marriott was unable to advance a persuasive reason as to why the accessible golf carts would or should be treated differently than any other capital expenditure under Marriott's management agreement, and conceded that it was not necessary for Marriott to obtain an owner's approval for other capital expenditures, such as the acquisition of riding lawn mowers. Moreover, Marriott's concern regarding the an owner's potential liability based on its acquisition of accessible carts at the courses it operates is extremely suspect given that Marriott was the one to establish the current policy by which disabled golfers may utilize their own accessible carts on courses owned *and operated by Marriott.* If owner liability based on alleged safety risks unique to accessible carts was really an issue, then such potential liability would seemingly undermine Marriott's current policy. Accordingly, the court concludes that joinder of owners is not required under

Rule 19(a)(1)(A) or (B). The court addresses in more detail the alleged safety risks associated with accessible carts in its discussion of the merits of plaintiffs' ADA claim.

### b. ADA Claim

#### i. Whether Plaintiffs' May Rely on ADA's General Anti-Discrimination Provisions in the Absence of DOJ Regulations

When the ADA was enacted, the Attorney General was instructed to establish standards to guide businesses, service providers, employers, and governmental entities in complying with Title III of the statute. *See* 42 U.S.C. § 12186(b) (directing the Attorney General to "issue regulations . . . to carry out the provisions of" Title III). Congress further provided that these implementing regulations must be consistent with the minimum guidelines issued by the Architectural and Transportation Barriers Compliance Board ("the Access Board"), an independent federal agency charged with issuing guidelines to ensure that public accommodations are accessible to individuals with disabilities. *See* 42 U.S.C. § 12186(c). In 1991, to fulfill the § 12186(b) mandate, the Department of Justice ("DOJ") adopted the ADA Accessibility Guidelines ("ADAAG") issued by the Access Board as its own regulations. *See* 28 C.F.R. Part 36.

The Access Board subsequently began the process of comprehensively amending ADAAG in 1994. In 2004, the Access Board published a final rule revising ADAAG. The revised ADAAG still have not been finally adopted by the DOJ, though.[2] In terms of golf courses, the revised ADAAG require that all newly constructed or altered golf courses have accessible routes connecting all "accessible elements and spaces within the boundary of the golf course" and that teeing grounds and putting greens "shall be designed and constructed so that a golfer can exit." 67 Fed.Reg. 56375. The Access Board, however, did not include a provision in the revised ADAAG requiring that accessible golf carts be provided. The Access Board noted that this omission was because the Board's jurisdiction

---

[2] Until the DOJ's currently pending rulemaking regarding adoption of the revised ADAAG is complete, the revised ADAAG are effective only as guidance to the DOJ. 69 Fed.Reg. 58768. They have no legal effect on the public. 69 Fed.Reg. 58768.

was limited to the physical environment - e.g., the design and construction of golf courses – as opposed to operational issues.  69 Fed.Reg. 58768, 58774.

Subsequently, on September 30, 2004, the DOJ issued an "Advanced Notice of Proposed Rulemaking" (ANPRM) to begin the process of revising the DOJ's ADA regulations to adopt standards consistent with the revised ADAAG published by the Access Board on July 23, 2004.  69 Fed.Reg. 58768.   In the ANPRM, the DOJ noted that it was considering the issue of accessible golf carts under the ADA even though the issue was not addressed by the revised ADAAG.  The ANPRM provides in pertinent part:

> Recreation Facilities: Golf Courses
>
> ADAAG now establishes comprehensive requirements for the design and construction of accessible golf courses. In addition to establishing scoping and technical requirements for individual elements in or serving the golf course, section 206.2.15 provides that--
>
> At least one accessible route shall connect accessible elements and spaces within the boundary of the golf course. In addition, accessible routes serving golf car rental areas; bag drop areas; course weather shelters complying with 238.2.3; course toilet rooms; and practice putting greens, practice teeing grounds, and teeing stations at driving ranges complying with 238.3 shall comply with Chapter 4 except as modified by 1006.2. EXCEPTION: Golf car passages complying with 1006.3 shall be permitted to be used for all or part of accessible routes required by 206.2.15.
>
> The Department anticipates that it will propose to adopt the ADAAG requirements for golf courses. However, the Department is aware that these requirements may raise operational issues that are within the purview of the Department's enforcement responsibilities.
> The Department has been asked whether, and under what circumstances, a golf course must make specially designed or adapted golf cars available to persons with mobility impairments who are not able to walk from a golf car passage to the fairways or to the green.
>
> The Department is considering addressing this issue in its ADA regulations by requiring each golf course that provides golf cars to make at least one, and possibly two, specialized golf cars available for the use of persons with disabilities, with no greater advance notice to be required from the disabled golfer than from other golfers. The Department believes that relevant considerations in determining whether and under what circumstances this requirement should be imposed include (i) whether the golf course makes golf cars available to golfers who are not disabled, (ii) the burden that such a requirement would impose on golf course facilities, and (iii) whether the course requires the use of golf cars during play.
>
> The Department understands that the principal type of special golf car

currently available is a one-seater with hand controls and a swivel seat (the swivel seat enables the golfer to play from the car). Golf course operators have expressed concern in the past that the available one-person cars (i) tip over easily on steep terrain and (ii) are too heavy for green use. Producers of newer designs for one-person cars claim to have overcome these problems.

69 Fed. Reg. 58768.

The September 30, 2004 ANPRM was simply the first of three steps in the regulatory process. Proposal to Issue Revised ADA Design Standards, http://www.ada.gov/proposal.htm (last visited January 23, 2008). The ANPRM must still be followed by a notice of proposed rulemaking ("NPRM"), and then a final rule. *Id.*

Marriott argues that because there is currently no DOJ regulation in effect requiring accessible carts, plaintiffs have no ADA claim. In support, it asserts that plaintiffs cannot simply rely on the ADA's general anti-discrimination provisions, noting that the specific ADA provisions should govern the general. Marriott further argues that even if plaintiffs may bring an ADA claim in the absence of a controlling DOJ regulation, this court should not rule on the claim given the pending DOJ rulemaking. It contends that plaintiffs brought the instant lawsuit because they were unsuccessful before the DOJ and the Access Board, and that they seek to preempt the pending DOJ rulemaking, and to have the court "make" the specific regulations instead. It contends that it is concerned that the DOJ may incorporate a standard that conflicts with any relief this court may order.

Plaintiffs respond that the ADA does not proscribe only those discriminatory practices that have been catalogued in the ADA, the ADAAG, and/or the DOJ regulations, but prohibits all practices which deprive individuals with disabilities from participating on an equal basis in recreational opportunities. Plaintiffs contend that the general anti-discrimination provisions of the ADA apply in the absence of *express* applicable regulations and/or guidelines, and note several cases in which courts have allowed claims to proceed despite the absence of controlling regulations. Plaintiffs thus argue that even if the current guidelines do not *expressly* require single-rider carts, the existing law and regulations should be interpreted to require them.

16

1    Plaintiffs further argue that Marriott should not be allowed to hide behind the

2    protracted DOJ rulemaking in order to shirk its current legal responsibilities.  They assert

3    that the DOJ's ongoing rulemaking process "neither nullifies the existing regulations for

4    public accommodations nor eviscerates the broad anti-discrimination provisions of the

5    ADA."  Plaintiffs additionally contend that Marriott's argument, taken to its logical extension,

6    would prohibit adjudication of disputes involving numerous aspects of life, given that in its

7    ongoing ADA rulemaking process, the DOJ is also considering rules affecting correctional

8    facilities, homeless shelters, halfway houses, office buildings, and hospitals, among

9    others.[3]

10    In cases where the Department of Justice has issued implementing regulations,

11    based on ADAAG, and the ADA itself is silent or ambiguous with regard to the specific

12    issue covered by the regulations, "the court must defer to the agency's answer [if it] is

13    based on a permissible construction of the statute." *Las Vegas Events, Inc.,* 375 F.3d at

14    876.  However, where ADAAG and the DOJ's implementing regulations do not articulate a

15    particular standard for a particular facility (e.g., a golf course or a movie theater), the

16    covered entity should nevertheless attempt to follow ADAAG to the greatest extent

17    possible.  Anne Marie Estevez & Beth S. Joseph, Public Accommodations Under the

18    Americans with Disabilities Act, § 2:6 (West 2007 ed.); *see also Las Vegas Events*, 375

19    F.3d at 875-76.

20    In *Fortyuna*, the Ninth Circuit rejected the very argument made by Marriott in this

21    case: "that ADA plaintiffs must prove that the defendant contravened a 'specific

22    _____

23    [3]Plaintiffs also argue that there is strong evidence that the DOJ, via its rulemaking, is
going to require accessible golf carts.  They point to the ANPRM itself, along with a November
24    2002 settlement agreement between the DOJ and City of Indianapolis, in which the DOJ
required the city to purchase and maintain two accessible golf carts, to notify golfers that such
25    carts were available, and to maintain records of the use of such carts.  Plaintiffs also point to
the Department of Interior's ("DOI") opinion that accessible golf carts are a "reasonable
26    modification" which *public* golf courses that provide standard golf carts must also provide.
Knestrick Decl., Exh. BB, CC.  Additionally, they note that the Department of Defense ("DOD")
27    has announced its intention to purchase accessible golf carts at all of the 174 golf courses it
operates on military bases.  Knestrick Decl., Exh. O.  However, as discussed *infra*, the court
28    found it unnecessary to consider this evidence in ruling on the issue.

requirement of ADAAG' to establish a violation of the ADA." 364 F.3d at 1085. Marriott's attempt to distinguish this case from *Fortyuna* based on the fact that the DOJ is currently in the middle of the rulemaking process is unpersuasive since the ANPRM has no legal effect until the final rulemaking is complete. *See* 69 Fed.Reg. 58768. Acccordingly, the court concludes that plaintiffs' ADA claim may go forward as a general ADA anti-discrimination claim in the absence of specific ADAAG standards or other DOJ implementing regulations. *See id.*

The pending DOJ rulemaking, which is far from final, does not prohibit the court from ruling on the ADA claim. The question, therefore, is not whether the court *can* act on plaintiffs' ADA claim in light of the current DOJ rulemaking proceedings, but whether it *should* act. It is unclear when the DOJ will issue a final regulation. However, given that it is currently 2008, the ANPRM was issued in 2004, and the DOJ has yet to issue even an NPRM, let alone a final rule, it appears that a final regulation may still be years away. Given this delay, and the fact that the final DOJ regulation ultimately may not even address the issue raised by plaintiffs in this case, the court declines to stay the proceedings indefinitely to wait for *possible* DOJ guidance. Additionally, the court sees no reason at this stage to "guess" the final outcome of the pending DOJ rulemaking proceedings, and therefore has not considered plaintiff's evidence regarding the DOJ/Indianapolis settlement, and the DOI and DOD policies, objected to by Marriott.

Marriott's motion for summary judgment is therefore DENIED on the above grounds.

**ii.      Whether Marriott's Current Policy Discriminates Against Mobility-Impaired Golfers**

Marriott argues that its current policy, which allows disabled golfers to play from their own assistive device, including their own accessible cart if they have one and are able to transport it to the course, to bring an assistant to ride the course with them, and to play from a standard cart under a medical flag, sufficiently accommodates mobility-impaired golfers and is non-discriminatory. *See* Nault Decl., Exh. T.

18

Plaintiffs respond that this policy is discriminatory because it places them, disabled golfers, in a distinctly unequal situation from their able-bodied counterparts. Plaintiffs contend that it is simply not possible for them to play at Marriott's courses under Marriott's current policy. First, plaintiffs note that they require an accessible cart to play golf because the carts enable them to operate the accelerator and brake by hand. Additionally, as noted, accessible carts feature swivel seats that allow plaintiffs to get into a hitting position to swing and strike a golf ball while remaining seated or strapped into the cart.

Plaintiffs are unable to get in and out of a standard cart, and are thus unable to play using a standard cart, even under a medical flag. Two of the three plaintiffs are unable to stand or walk, and one is unable to get in and out of a standard cart due to ensuing pain. Additionally, plaintiffs note that they are not able to simply golf from their wheelchairs, and assert that the fact that a few mobility-impaired golfers may have the ability to wheel themselves around the golf course and hit the ball from their wheelchair does not change the fact that plaintiffs require the accommodation of an accessible cart.

Furthermore, plaintiffs note that it is also not feasible for them to simply transport their own carts to Marriott courses because they are physically unable to load the carts on and off of a trailer, as required for transport. Moreover, assuming plaintiffs were physically capable of transporting the carts, which they are not, they would still be prevented from playing at non-local courses, including on vacation and/or at business conventions, where they did not actually tow the accessible cart to the course.

Although Marriott refers to anecdotal evidence of other disabled golfers who are able to golf in accordance with its current policy, it does not dispute that plaintiffs require an accessible golf cart in order to play golf at its courses, or that plaintiffs are physically unable to transport their own accessible carts to the Marriott golf courses they desire to play.

Title III of the ADA outlaws not just intentional discrimination but also certain practices that have a disparate impact upon persons with disabilities even in the absence of any conscious intent to discriminate. *Indep. Living Res. v. Or. Arena Corp.*, 1 F.Supp.2d 1159, 1169 (D. Or. 1998); *see also Fortyune*, 364 F.3d at 1080. Thus, a public

accommodation may not "utilize standards or criteria or methods of administration that have the *effect* of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control." 28 C.F.R. § 36.204 (emphasis added); *see also Indep. Living Res. v. Or. Arena Corp.*, 982 F.Supp. 698, 733 (D. Or. 1997) ("the ADA requires more than merely refraining from active discrimination. . . ., [t]he operator of a public accommodation may also be required to take affirmative steps to ensure that the 'opportunity' to patronize the facility is a meaningful one").

Within reason, a public accommodation may be required to modify its policies, practices, or procedures to mitigate any disparate impact upon persons with disabilities. 28 C.F.R. § 36.302(a). Public accommodations must also take affirmative measures to ensure that such persons have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are available from that public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §§ 36.202(b), 36.201(a); *see also Indep. Living*, 982 F.Supp. at 733 ("[a]s a general rule, the objective of Title III is to provide persons with disabilities who utilize public accommodations *with an experience that is functionally equivalent to that of other patrons*, to the extent feasible given the limitations imposed by that person's disability") (emphasis added).

Marriott's current policy does not provide plaintiffs, mobility-impaired golfers, with an experience that is functionally equivalent to that of other non-disabled golfers. Plaintiffs here have presented overwhelming evidence that they are unable to golf at Marriott's courses under the current policy. By contrast, non-disabled golfers can simply show up at the course and Marriott will provide them with a functional cart as part of the cost of their round of golf. Accordingly, Marriott provides golf carts for able-bodied golfers, but does not provide accessible carts for mobility-impaired golfers like plaintiffs. Because Marriott's policy places plaintiffs in a distinctly unequal situation, as compared to their able-bodied counterparts, it is discriminatory under the ADA.

### iii. Whether Plaintiffs' Proposed Accommodation Constitutes an Undue Burden on Marriott because it Poses a "Direct Threat"

Even though plaintiffs are able to establish a prima facie case of discrimination, Marriott's failure to make modifications will not constitute discrimination if it "can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii); *see Lentini,* 370 F.3d at 843 -844.   Whether an accommodation fundamentally alters a service or facility is an affirmative defense, and is "an intensively fact-based inquiry." *Id.; see also PGA Tour,* 532 U.S. at 683-85 (holding that a golf course's prohibition of golf carts was "not an essential attribute of the game itself" and was "not an indispensable feature of tournament golf either," and therefore that allowing Casey Martin to use a golf cart would not be a fundamental alteration).   Additionally, Marriott is not required to make a modification or alteration, where allowing a disabled individual "to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations ... [would] pose[ ] a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3).

Marriott raised a direct threat defense in its motion papers.  It argued that the accessible carts requested by plaintiffs present an undue burden because they would result in a direct threat to the safety of other golfers.  However, on the record at the December 12, 2007 hearing, counsel for Marriott suggested that although Marriott had not argued that the acquisition of accessible carts would alter the nature of the services it provided, thus raising a fundamental alteration defense "per se," that such a defense could simply be considered a continuum of its undue burden defense, as far as the cost and potential liability posed by the modification were concerned.  Marriott's counsel subsequently conceded, though, that its liability argument was tied to its concerns regarding the safety of the accessible carts, and also conceded that the financial cost of the proposed modification was "minimal." Accordingly, as noted on the record, the court finds that to the extent that Marriott challenges the safety of the accessible carts, it is really raising only a direct threat defense,

1  and *not* a fundamental alteration defense, a conclusion that is further supported by review

2  of the arguments made by Marriott in its papers.

3      In support of its direct threat defense, Marriott contends that it is not clear that the

4  accessible carts are safe, and that the DOJ is still evaluating their safety in conjunction with

5  the currently pending rulemaking.  Marriott also asserts that one of the reasons it instituted

6  its pilot program was to enable it to competently respond to the DOJ's inquiries regarding

7  the rulemaking.  It argues that until accessible carts are subjected to an independent safety

8  standard and their safety is reviewed by the DOJ, this court should not order such an

9  accommodation.

10     In support, Marriott cites to a May 18, 2005 letter from the National Golf Car

11  Manufacturers Association (NGCMA) written in response to the DOJ's request for

12  comments on the pending rulemaking, in which the NGCMA concluded that "until and

13  unless single rider so-called 'adaptive' golf cars are subjected to rigorous safety testing and

14  are the subject of their own American National Standards Institute (ANSI) . . . sanctioned

15  safety and performance standard, they should not be mandated by DOJ for either purchase

16  or use on golf courses."  Hurley Decl., Exh. L.  The NGCMA notes that there have been

17  roll-over concerns because the carts may tip on steep terrain, and also concerns regarding

18  the sun protection provided by the accessible carts.  *Id.*

19     Marriott also submitted a declaration from Tom Houston, the chairperson of the

20  ANSI standards committee for accessible cars and a member of the National Alliance for

21  Accessible Golf (NAAG), who attests to two accidents of which he is aware involving

22  accessible carts.  One involved a roll-over, and the other involved a golfer who backed her

23  accessible cart into a lake, and who claimed she would have drowned if she had been

24  strapped into the accessible cart as recommended.

25     In support of its safety concerns, Marriott also submitted an April 2001 recall alert

26  from one of the accessible cart manufacturers, in which the manufacturer recalled the car

27  because "its software can be corrupted by static electricity allowing it to move forward

28  without assistance."  Hurley Decl., Exh. N.  The alert noted that the manufacturer "received

one report of a showroom golf cart that continued to operate after it was turned off," but that "no injuries have been reported." *Id.*

Finally, Marriott cites to safety concerns it learned during the course of discovery, including that the carts require that golf clubs be mounted in front of the driver's face or chest, which, according to Marriott, could potentially obstruct the driver's view and also pose a risk that the clubs could be propelled back into the driver's face or body. Hurley Decl., Exh. R.

Plaintiffs respond that Marriott's safety concerns are bogus. They argue that the direct threat exception is inapplicable here because Marriott's concerns are merely speculative. Specifically, plaintiffs contend that the absence of ANSI standards governing accessible carts does not mean that the carts are unsafe. They note that ANSI standards are voluntary, the product of negotiation, and that, indeed, one model of an accessible cart, the Solorider, has been tested against and passed applicable ANSI standards. Pretekin Decl., ¶ 3; Thesing Decl., ¶¶ 6-10.

Plaintiffs further contend that accessible carts are no more dangerous than standard carts, and note that standard carts utilized by Marriott have been recalled for much more serious problems than the accessible cart recall cited by Marriott. Knestrick Oppos. Decl., Exh. K. Plaintiffs also note that there has never been a report of any significant personal injury connected with the use of an accessible cart throughout their twenty years of use. McGovern Decl. ¶ 20. They argue that there is no reason to believe that a first-time user of an accessible cart is any less experienced with that cart than the first-time driver of a standard cart is with his/her standard cart.

Finally, plaintiffs suggest that Marriott's safety concerns are not genuine given the fact that Marriott expressly allows disabled golfers to bring their own accessible carts to all of its courses.

A "direct threat," is defined as "a significant risk to the health or safety *of others* that cannot be eliminated by a modification of policies, practices, or procedures, or by the

provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3) (emphasis added). The controlling regulations provide that:

> In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

28 C.F.R. § 36.208(c).

The entity asserting a "direct threat" as a basis for excluding an individual bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others. *Lockett v. Catalina Channel Exp., Inc.* 496 F.3d 1061, 1066 (9th Cir. 2007). A good faith belief that a risk exists is not sufficient. *Bragdon v. Abbott,* 524 U.S. 624, 649 (1998). The person making the relevant decision not to provide the service must base his decision on the objective information available to him. *See id.* For example, in *Bragdon*, a case in which a dentist declined to see an HIV-positive patient because he claimed she would pose a health risk to others, the Supreme Court elaborated on the "direct threat" standard:

> The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence. As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability. To use the words of the question presented, petitioner receives no special deference simply because he is a health care professional.

*Id.*

Marriott conceded on the record at the hearing on the parties' motions that it is only alleging that the accessible carts pose a direct threat to the safety of the golfer himself or herself, and *not* to "others." December 12, 2007 Transcript at 32-33 ("the direct threat in this context would be limited to the individual using the cart" and "it would be specious . . . to claim that there [would] be a direct threat to third parties because of a single-rider cart").

1    Accordingly, Marriott's direct threat defense requires that this court interpret 42 U.S.C. §

2    12182(b)(3) to include a threat to the disabled individual himself or herself.

3        In its papers, Marriott cited to the United States Supreme Court's decision in

4    *Chevron v. Echazabal*, 536 U.S. 73, 78-79 (2002), in support of such an interpretation.

5    *Chevron*, however, was an employment case, and involved Title I of the ADA - *not* Title III

6    at issue here.  Under Title I of the ADA, an employer is prohibited from using qualification

7    standards "that screen out or tend to screen out an individual with a disability."  42 U.S.C. §

8    12112(b)(6).  However, an employer has an affirmative defense to discrimination under

9    Title I where employment of the individual would "pose a direct threat to the health or safety

10   of other individuals in the workplace."  *Id.* at § 12113(b).  Subsequently, the Equal

11   Employment Opportunity Commission ("EEOC") issued regulations that interpreted §

12   12113(b) to apply to circumstances where the employment would pose a direct threat to

13   the health and safety of the individual as well.  *See* 29 C.F.R. § 1630.15(b)(2) (providing

14   that "[t]he term 'qualification standard' may include a requirement that an individual shall

15   not pose a direct threat to the health or safety *of the individual* or others in the workplace").

16       In *Chevron*, an oil refinery refused to hire an applicant who had a severe liver

17   condition that would be exacerbated by exposure to toxins, contending that it could refuse

18   the applicant employment based on his condition because employment posed a safety risk

19   to the applicant himself.  The applicant brought a discrimination claim against Chevron

20   under Title I of the ADA.  The Ninth Circuit subsequently held that the EEOC regulation on

21   point, as set forth above, violated the ADA because the ADA's direct threat defense only

22   applied where there was a risk to *others.*  213 F.3d 1098, 1102 (9th Cir. 2000).  The

23   Supreme Court, however, reversed the Ninth Circuit, and held that the EEOC regulation,

24   which allowed employers to screen out a disabled worker whose *own* health and safety

25   was at risk, was a permissible expansion of the direct threat language in Title I of the ADA.

26   536 U.S. at 78.

27       This case is different than *Chevron*, though.  Significantly, there is not an

28   implementing regulation for Title III equivalent to the EEOC regulation in *Chevron* that

would support interpreting 42 U.S.C. § 12182(b)(3) to include a direct threat to the covered individual himself or herself.  Moreover, Marriott was unable to cite to any authority extending the *Chevron* Court's holding regarding Title I to Title III of the ADA.  Given these factors, the court declines to interpret the statute at issue here, which expressly defines a "direct threat" as "a significant risk to the health or safety *of others*," 42 U.S.C. § 12182(b)(3), to apply where the threat is only to the covered individual himself or herself.

Accordingly, because Marriott has conceded that the accessible carts do not pose a direct threat to the health or safety of *others*, the court DENIES Marriott's motion for summary judgment on this basis.

### iv.    Conclusion

In sum, the court concludes that plaintiffs have established a prima facie case for discrimination under the ADA's general anti-discrimination provisions based on Marriott's failure to make reasonable accommodations.  *See, e.g., PGA Tour*, 532 U.S. at 683 n. 38. First, there is no dispute that plaintiffs are disabled as that term is defined by the ADA. Second, there is no dispute that Marriott is a private entity that owns, leases, and/or operates numerous golf courses nationwide, which are all places of public accommodation. Third, for the reasons set forth above, the court concludes that Marriott's policy, by which it refuses to provide accessible carts to disabled golfers, discriminates against plaintiffs, mobility-impaired golfers.  Fourth, although Marriott is currently testing a "pilot program" at the four golf courses it owns, it has nevertheless refused to implement the same type of modification accommodating plaintiffs at the courses it operates, and has conceded that the pilot program is of a temporary nature.

Moreover, the court finds that the provision of accessible golf cart(s) at Marriott's courses, is both reasonable and necessary to accommodate the plaintiffs' disabilities in this case.  There is overwhelming evidence that plaintiffs require this accommodation in order to golf on Marriott courses, and that the accommodation is therefore "necessary." Additionally, there is also sufficient evidence that the accommodation is "reasonable," in so far as the evidence suggests that there have been no significant injuries involving the use

26

of accessible carts during the past twenty years, and Marriott itself concedes that the financial costs of such a modification are minimal. Finally, the court finds that Marriott has not met its heavy burden in establishing that provision of the accessible carts at its courses would pose a direct threat to the health and safety of others.

As noted above, plaintiffs' ADA claim is based on three theories of discrimination, including (1) Marriott's failure to make reasonable accommodations under 42 U.S.C. § 12182(b)(2)(A)(ii); (2) Marriott's failure to remove barriers under 42 U.S.C. § 12182(b)(2)(A)(iv); and (3) Marriott's failure to provide auxiliary aids and services under 42 U.S.C. § 12182(b)(2)(A)(iv). Because the court concludes that plaintiffs are entitled to summary judgment based on Marriott's failure to make reasonable accommodations, it declines to reach the other two grounds, including Marriott's failure to remove barriers and to provide auxiliary aids, since judgment in favor of plaintiffs on the first ground entitles them to declaratory and injunctive relief.

### v. Evidentiary Objections

Both parties filed numerous evidentiary objections. The court declines to rule individually on each of plaintiffs' objections, and notes that in concluding that plaintiffs are entitled to summary judgment on their ADA claim, the court has considered *all* evidence and declarations submitted by Marriott in support of its motion for summary judgment and in opposition to plaintiffs' motion for summary judgment, including the evidence objected to by plaintiff.

Turning to Marriott's objections, the court notes that Marriott filed some of its objections as separate motions and/or documents, and others were contained within its motion papers. Some that are in its briefs are duplicative of the separately-filed documents, and others are not. The court has attempted below to comprehensively cull and compile Marriott's various objections from all of its documents.

Marriott filed objections in three different places to exhibits attached to the Knestrick Declaration, filed in support of plaintiffs' motion for summary judgment. These exhibits include the DOJ settlement and DOI and DOD letters/reports at Exh. O, AA, and BB to the

Knestrick Declaration. Marriott's objections are found in: (1) its opposition brief at 9-12; (2) a separately-filed motion to strike the Knestrick declaration; and (3) another separately-filed document entitled "evidentiary objections."

Plaintiffs submitted this evidence to further their argument that the DOJ, via its pending rulemaking, is going to require accessible golf carts. However, as this court noted above at pages 17-18 of this order, because it declines to "guess" the outcome of the DOJ rulemaking, the court has not considered the above evidence submitted by plaintiffs, and objected to by Marriott.

Marriott also filed objections to evidence plaintiffs submitted in support of their opposition to Marriott's motion for summary judgment in two different places. In its reply brief, Marriott filed objections to plaintiffs' McGovern and Thesing declarations. Marriott also filed a separate document containing evidentiary objections to the McGovern and Thesing declarations, and also to the Hikel, Pretekin, and Knestrick declarations filed in support of plaintiffs' opposition brief.

<u>McGovern Oppos. Declaration</u>

McGovern is one of plaintiffs' experts, and a chair of the National Alliance for Accessible Golf (NAAG) Single Rider Car Task Force. He advises local unit governments and privately owned golf courses regarding the acquisition of accessible golf carts, and opines in his declaration regarding the safety of accessible carts.

As noted, both Marriott's reply brief and its separately-filed evidentiary objections contained objections to McGovern's declaration. Unfortunately, the two are not consistent. The court has utilized Marriott's separately-filed evidentiary objections because those were more comprehensive.

Marriott seeks to strike several paragraphs from McGovern's declaration, including ¶¶ 10, 11, 13, 14, 16, 17, 21, and 22. The court OVERRULES Marriott's objections to ¶¶10, 13, 17, 21, and 22, and SUSTAINS Marriott's objections to ¶¶ 11, 14, and 16.

////

////

<u>Hikel Oppos. Declaration</u>

John Hikel is a general partner with ParaBase, and the exclusive distributor of one brand of accessible carts, the Paramobile. Marriott seeks to strike ¶ 4 of Hikel's declaration as hearsay. The court SUSTAINS Marriott's objection.

<u>Thesing Oppos. Declaration</u>

Thesing is one of the plaintiffs. Marriott seeks to strike several paragraphs from Thesing's declaration, including ¶¶ 5, 7, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21.

The court OVERRULES Marriott's objections to ¶¶ 5 at page 2 ll. 26-28, 3 ll. 1-6; ¶ 7; ¶ 9 at ll. 9-11, 13-16; ¶ 12; ¶ 13; 15 ll. 9-14; ¶ 16 ll. 18-21; ¶ 18; and ¶ 19; and SUSTAINS Marriott's objections to ¶ 5 ll. 8-9; ¶ 8; ¶ 9 ll. 11-12; ¶ 14; ¶ 15 ll. 15-17; ¶ 16 ll. 22-25; ¶ 17; and ¶ 20.

<u>Pretekin Oppos. Declaration</u>

Pretekin is the president of Solorider, which manufactures and distributes the Solorider accessible cart. Marriott seeks to strike several paragraphs from Pretekin's declaration, including ¶¶ 4, 8, 9, and 10. The court SUSTAINS Marriott's objections to all four paragraphs.

<u>Knestrick Oppos. Declaration</u>

Knestrick is plaintiffs' attorney. Marriott seeks to strike several paragraphs from Pretekin's declaration, including ¶¶ 3, 4, 5, and 6. The court OVERRULES Marriott's objections to all four paragraphs

**c.      State Law Claims**

Because the court concludes that plaintiffs are entitled to summary judgment on their ADA claim based on Marriott's failure to make reasonable accommodations, it also concludes that plaintiffs are entitled to summary judgment on their CDPA and Unruh Act claims as well. *See Pickern*, 194 F.Supp.2d at 1130; Cal. Civ. Code §§ 51(f), 54(c).

**d.      Specificity of Injunctive Relief**

Marriott argues that the court cannot possibly enter injunctive relief that is clear and enforceable under Federal Rule of Civil Procedure 65 because plaintiffs themselves cannot

even agree what constitutes an "accessible cart," and because there are many differences in the carts' features and in the brands of accessible carts. Marriott claims the court would need to address the following specific features in any order granting injunctive relief: (1) roll-over protection; (2) stand-up seats; (3) sun canopies; (4) score card holders; and (5) baskets. Marriott further contends that the court will need to determine how and when the accessible carts should be used, including when and where on the course, who may use them, and the training that a user should receive.

In reply, plaintiffs assert this case is not about which cart Marriott should buy or lease or how many carts should be made available, but is about Marriott's failure to make any effort to accommodate disabled golfers who desire, and are entitled, to golf at its courses. They argue that they are not asking the court to make any engineering, architectural, or policy determinations as to which particular design features are feasible and desirable. They note that their "omission of evidence regarding the comparative merits of the single rider carts currently on the market is not an oversight, but a reflection of the fact that they are asking the court to adjudicate and declare Marriott's *legal responsibility* to accommodate plaintiffs' disabilities."

Federal Rule of Civil Procedure 65(d) provides in pertinent part:

(1) Contents. Every order granting an injunction and every restraining order

must:

      (A) state the reasons why it issued;

      (B) state its terms specifically; and

      (C) describe in reasonable detail--and not by referring to the complaint

      or other document--the act or acts restrained or required.

"'[O]ne basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.'" *Fortyune*, 364 F.3d at 1086 (quoting *Union Pac. R.R. v. Mower,* 219 F.3d 1069, 1077 (9th Cir. 2000)).

In *Fortyune*, the Ninth Circuit rejected an argument very similar to the one made by Marriott in this case. In that case, the district court granted the plaintiff injunctive relief under Title III of the ADA, and issued an injunction ordering the defendant movie theater to "modify its policies regarding companion seating to ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats . . . [up until] ten (10) minutes prior to show time." 364 F.3d at 1086-87. On appeal, the Ninth Circuit rejected the defendant's argument that the district court was required in the injunction to elucidate *how* it should comply with the injunction. The court held that Rule 65(d) did not require that of the district court, but rather required the court to "describe in reasonable detail . . . the act or acts sought to be restrained." *Id.* It found that the district court's injunction did so, and was not in violation of Rule 65(d), even though it declined to provide the movie theater with explicit instructions on the appropriate means to accomplish this directive. *Id.* (citing *Independent Living,* 1 F.Supp.2d at 1173 n. 16 (leaving "logistical matters" concerning the implementation of an injunction "in the capable hands of the [defendants]")).

The *Fortyune* court ultimately concluded that the injunction was sufficiently specific under Rule 65(d) because it provided "fair and precisely drawn notice of *what* the injunction actually prohibits." *Id.* It further noted that despite the district court injunction's failure to specify how to comply with its terms, the court was "confident that [the movie theater] is capable of devising such means, particularly in light of the numerous workable suggestions articulated at oral argument." *Id.*

Based on *Fortyuna*, the parties' papers, and the parties' arguments at the December 12, 2007 hearing, the court rejects Marriott's argument that injunctive relief is impossible under Rule 65. However, the court declines to enter injunctive relief at this time, and by separate order, will set a settlement conference at which the parties will be required to discuss and attempt to resolve the specific contours of the injunction to be entered in this case. The court nevertheless notes, as it did on the record at the hearing, that it is

1     disinclined to reach all of the features and precise parameters advanced Marriott, e.g., the

2     existence of a sun canopy, in any injunction that is entered.

### CONCLUSION

For the above reasons, the court GRANTS IN PART plaintiffs' motion for summary

judgment as to liability on their: (1) ADA claim based on Marriott's failure to make

reasonable accommodations; (2) CDPA claim; and (3) Unruh Act claim. The court DENIES

Marriott's motion for summary judgment.

The court declares that Marriott violated the ADA, and for those courses which

Marriott owns and operates in California, the CDPA and the Unruh Act as well, by failing to

provide accessible golf carts as a reasonable accommodation for plaintiffs' mobility

impairments.

The court, however, declines to enter injunctive relief at this time, but under separate

order, will set a settlement conference to permit the parties to address the scope of such

relief. Following the settlement conference, a case management conference will be held to

determine if further briefing or argument is necessary before the court determines the

injunctive relief to which plaintiffs are entitled.

The upcoming pretrial and trial dates are VACATED.

Plaintiffs' motion to seal the supplemental Knestrick declaration is DENIED based on

the court's prior ruling that Marriott's management agreements should be filed in the public

record.

**IT IS SO ORDERED.**

Dated: January 28, 2008

_____

PHYLLIS J. HAMILTON
United States District Judge